UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 14-23850-CIV-ALTONAGA/O'Sullivan

**YOURY TUNDIDOR**,

    Plaintiff,
v.

**MIAMI-DADE COUNTY**,

    Defendant.
_____/

## ORDER

THIS CAUSE came before the Court upon Defendant, Miami-Dade County's ("County['s]") Motion to Dismiss Plaintiff's Amended Complaint ("Motion") [ECF No. 34], filed April 20, 2015. The County seeks a dismissal of the "Amended Complaint in Admiralty and Request for Trial by Jury" ("Complaint") [ECF No. 5] on the basis there is no admiralty jurisdiction in fact, and because admiralty jurisdiction is the only jurisdictional ground asserted, the Court lacks subject matter jurisdiction. As the County aptly describes its position, Plaintiff, Youry Tundidor ("Tundidor"), "seeks to have a personal injury claim that allegedly arose during a recreational boating trip on an in-land drainage canal with no access to navigable waters litigated in a federal forum applying a specialized body of federal law designed to address claims that affect the maritime shipping industry in waters that serve as arteries of interstate commerce." (Reply 1 [ECF No. 44-1]). Tundidor filed his Response [ECF No. 36] on May 7, 2015. The County filed its Reply on May 18, 2015.[1]

---

[1] The County filed a timely Reply [ECF No. 43] on May 18, 2015, and a Corrected Reply [ECF No. 44-1] on May 19, 2015, that fixed a footnote cut off in the May 18 filing. For purposes of this Order, "Reply" refers to the corrected memorandum filed on May 19.

The Court has carefully reviewed the parties' written submissions and applicable law. For the reasons explained below, the Court finds it does not have subject matter jurisdiction and grants the Motion.

## I.  BACKGROUND

A.  Plaintiff's Allegations

Plaintiff alleges in January 1969, the County acquired 31 privately owned water and sewer systems operating in the County to create a unified public utility system. (*See* Compl. ¶ 7). The County acquired General Waterworks Corporation, a private company that owned and operated water and sewer systems in the County. (*See id.* ¶ 8). Prior to the acquisition, General Waterworks owned and operated an aerial water line as well as an aerial sewer line that crosses over a navigable canal waterway (the "Coral Park Canal"), and runs parallel to a canal bridge at Southwest 94 Avenue and Southwest 12 Street in Miami (the "Coral Park Canal Bridge"). (*See id.* ¶ 9). The Coral Park Canal Bridge lies between the water line and the sewer line; the water line is on the south side of the Coral Park Canal Bridge while the sewer line is on the north side of the Coral Park Canal Bridge. (*See id.*). The water and sewer lines are appurtenances to the Coral Park Canal Bridge. (*See id.*).

The Coral Park Canal connects to the Tamiami Canal, which connects to the Miami River, which leads out to Biscayne Bay and from there to the Atlantic Ocean. (*See id.* ¶ 10). The Coral Park Canal, Tamiami Canal, and Miami River are allegedly navigable waterways. (*See id.*). The County owns, operates, controls and maintains the Coral Park Canal Bridge, the water line, and the sewer line. (*See id.* ¶¶ 11, 12). The County created or maintained and allowed an obstruction to navigation to continue to exist on the Coral Park Canal in violation of 33 U.S.C. section 403, and 33 C.F.R. sections 116(c) and 114.10. (*See id.* ¶ 13).

On July 6, 2013, Tundidor was a passenger on a vessel traveling south on the Coral Park Canal. (*See id.* ¶¶ 20–21). As the vessel approached the Coral Park Canal Bridge from the north and exited the south side of the Bridge, Tundidor was struck without warning on his forehead and face by a six-inch main water line attached to and running parallel with the south side of the Bridge. (*See id.* ¶ 21). Plaintiff suffered damages and now brings a claim of negligence against the County. (*See id.* 5).

  B.  <u>Additional Information Following Jurisdictional Discovery</u>

Defendant first moved to dismiss the Complaint on December 12, 2014 (s*ee* Motion to Dismiss [ECF No. 12]), raising the same argument it raises now. Following a hearing on December 23, 2014 [ECF No. 16], the Court allowed the parties time to conduct jurisdictional discovery. As the present Motion presents a factual challenge to the Court's subject matter jurisdiction, the Court considers the additional factual information supplied following that discovery.

According to the information furnished by the County, the Coral Park Canal is not connected to the Tamiami Canal, Miami River, Biscayne Bay, or Atlantic Ocean in a manner that allows a maritime vessel to travel on a continued highway where interstate commerce can be conducted. (*See* Mot. 3). Further, the County asserts neither the Coral Park Canal nor the Tamiami Canal is presently capable of supporting interstate commercial activity. (*See id.*).

In support, the County submits a number of sworn statements and exhibits. (*See id.* Exs. 1–12). These show the Coral Park Canal connects to the Tamiami Canal underneath Southwest 8 Street through a low-lying bridge at the intersection of Southwest 94 Avenue and Southwest 8 Street. At its point of connection with the Coral Park Canal, the Tamiami Canal runs parallel to 8 Street and continues eastward past the Miami International Airport and toward the Miami

River. Eastward travel along the Tamiami Canal from the Coral Park Canal is obstructed by a series of low-lying bridges, water pipes, and railroad tracks. In total, there are at least 15 bridges, four water pipes, and two railroad tracks east of the Coral Park Canal creating areas of significant low clearance along the Tamiami Canal. The water pipes along the Tamiami Canal are stationary objects; none of the bridges or railroad tracks is a moveable, bascule-type bridge that can open to permit larger vessels to pass through.

In addition to the areas of significant low height clearance, many of the bridges and water pipes are supported by submerged structural columns narrowing the passages and making them considerably narrower than the Tamiami Canal itself. The bridge at 8 Street and the southbound Palmetto Expressway, for example, contains at least four structural columns in the Tamiami Canal narrowing the available area for a vessel to pass under the bridge. According to Susan Sylvester of the South Florida Water Management District, "the Army Corps of Engineers had previously made a designation that the C-4 Canal [the Tamiami Canal] was not designed or purposed for navigation." (Susan Sylvester Dep., Mot. Ex. 8, 101:12–18 [ECF No. 34-8] (bracketed language added)). The County explains the Tamiami Canal is not capable in its present state of supporting commercial maritime activity because it does not have a navigable connection to the Miami River.[2] (*See* Mot. 7 (stating subject matter jurisdiction is "lacking because the Tamiami Canal does not have a navigable connection to the Miami River.")). Because of a water control structure (the "S-25B Spillway") at the eastward end of the Tamiami Canal, no vessels in that Canal may access the Miami River, Biscayne Bay, or the Atlantic Ocean. In fact, prominent signs at the S-25B Spillway state: "DANGER – NO BOATING BEYOND THIS POINT." (*Id.* 9; Mot. Ex. 10, 6 [ECF No. 34-10]).

---

[2] The Miami River is a navigable waterway. *See Sea Vessel, Inc. v. Reyes*, 23 F.3d 345, 346 n.1 (11th Cir. 1994).

Marina Blanco-Pape is a professional engineer with the County's Public Works and Waste Management Division. Ms. Blanco-Pape submitted an affidavit attesting that at the Coral Park Canal connection to the C-4 or Tamiami Canal, a low lying bridge not intended for navigation by vessels is found, and the Coral Park Canal is connected to the C-2 or Snapper Creek Canal by a non-navigable culvert. (*See* Affidavit of Marina Blanco-Pape ("Blanco-Pape Aff."), Mot. Ex. 2, ¶ 5 [ECF No. 34-2]). Coincidentally, a section entitled "Detailed Narrative" in Plaintiff's "Boating Accident Report" [ECF No. 36-3] states "[a]ll four persons on board [Plaintiff's 16-foot, single engine boat] saw the bridge coming and lowered their heads." (*Id.* at 2 (alterations added)). Ms. Blanco-Pape further attests, and this is shown in DVDs submitted conventionally by Plaintiff (*see* Notice of Conventional Filing [ECF No. 39]), that there are a series of control gates, culverts, and pump stations interrupting through and open navigation from the Tamiami Canal to the Miami River and Biscayne Bay. (*See* Blanco-Pape Aff. ¶ 7).

In response, Tundidor submits the affidavit of Miami historian, Paul S. George, Ph.D., who describes the history and purpose of the Tamiami Canal, and opines:

> In summary, the C-4/Tamiami Canal is a navigable commercial waterway. The canal has historically served as a navigable waterway supporting commercial vessel activity between Florida, Native Americans, and out to the Atlantic Ocean. Since that time, the waterway has not been physically altered and continues its flow through Miami-Dade County east to the Miami Canal and out to Biscayne Bay and the Atlantic Ocean. While the S25B Spillway was erected and is operated in a manner which temporarily interrupts vessel traffic continuing through the natural flow of water out to the Ocean, there exists no impediment [to] navigation subject to minor portage of vessels around the Spillway. Future removal of the Spillway or construction of adjacent lock facilities in the future would provide for unfettered navigation from the canal to the Ocean. As such, the C-4/Tamiami Canal is capable of supporting commercial vessel navigation.

(Affidavit of Paul S. George, Ph.D. ("George Aff."), Resp. Ex. 1, ¶ 16 [ECF No. 36-1] (alteration added)). Angler's Guides for the Southeast Florida Canals promote fishing on the canals; fishing is a contemporary commercial endeavor in South Florida. (*See id.* ¶ 15).

With respect to the County's contention the Coral Park Canal is not navigable because of the low clearance of the bridge at S.W. 94 Street Avenue and S.W. 8 Street, Tundidor submits the declaration of Alejandro Suarez. Mr. Suarez states he navigated his vessel (a two-person canoe) under that bridge to get from the Coral Park Canal to the Tamiami Canal. (*See* Declaration of Alejandro Suarez ("Suarez Decl."), Resp. Ex. 2, ¶¶ 3, 7 [ECF No. 36-2]). As shown in satellite photographs and three DVDs filed by Plaintiff, Mr. Suarez navigated his canoe from the Coral Park Canal through the Tamiami Canal, to the Miami River which leads out to Biscayne Bay and the Atlantic Ocean. (*See generally id.*; DVDs (3)).

In response to the County's reliance on the lack of a navigable connection between the Tamiami Canal and the Miami River given the obstruction caused by the S-25B Spillway, Tundidor emphasizes Suarez's "successful minor portage around the Spillway,"[3] or overland transport, and the "natural flow of water [that] continues along the Tamiami Canal, through the Spillway (S-25B), into the Miami River, into Biscayne Bay, and ultimately into the Atlantic Ocean" (Resp. 13–14 (alteration added)), as noted by Dr. George. Finally, Tundidor relies on the U.S. Environmental Protection Agency's own description of the Tamiami Canal as a "navigable water of the United States" in a Consent Agreement and Final Order (*id.* Ex. 5 ¶ 6 [ECF No. 36-5]); and the Miami-Dade Expressway Authority's acknowledgement in an internal report that the Tamiami Canal "continues to remain significant in its roles as an important water management system, transportation corridor, and recreational facility" (*id.* Ex. 6, 3 [ECF No. 36-6]).

---

[3] "Portage is the act of carrying or otherwise transporting boats or goods overland between navigable waters, often around a waterborne obstruction that otherwise prevents navigation." J. Jones, *Portage Necessity as Affecting Navigability of Waterway Under Nonenvironmental Federal Law*, 3 A.L.R. Fed. 2d 375, § 1 (2005).

## II. STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) may present a facial or a factual attack to subject-matter jurisdiction. *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). The County brings a factual attack, challenging the existence of subject-matter jurisdiction in fact, and so "no presumptive truthfulness attaches to plaintiff's allegations." *Laurence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). Further, in a factual challenge it is the plaintiff's burden to prove the facts establish subject matter jurisdiction. *See OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002).

## III. ANALYSIS

### A. Navigability for Purposes of Admiralty Jurisdiction

The federal courts have subject matter jurisdiction over admiralty cases pursuant to Article III, Section 2, and 28 U.S.C. section 1333(1)[4]. For admiralty jurisdiction to encompass actions in tort, the wrong must occur on navigable waters and bear a significant relationship to traditional maritime activity. *See Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 268 (1972); *Harville v. Johns-Manville Prods. Corp.*, 731 F.2d 775, 781 (11th Cir. 1984) (citations omitted). The County does not challenge the "nexus requirement" of this two-part test is met, for it cannot; vessels are engaged in traditional maritime activity when a collision occurs on navigable waters. *See Richardson v. Foremost Ins. Co.*, 641 F.2d 314, 316 (5th Cir. 1981) ("We hold that two boats, regardless of their intended use, purpose, size, and activity, are engaged in traditional maritime activity when a collision between them occurs on navigable waters."); *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999) ("In light of *Foremost*, the

---

[4] Under section 1333(1), courts have "original jurisdiction . . . of . . . [a]ny civil case of admiralty or maritime jurisdiction." *Id.* (alterations added).

7

parties do not dispute that if the first part of the jurisdictional test is satisfied, the second is as well."). Because the County's sole contention is the accident did not occur on navigable waters, this Order only addresses whether this first requirement is satisfied.

A definition of navigable waters was first articulated in *The Daniel Ball*, 10 Wall. 557, 19 L. Ed. 999 (1871):

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

*Id.* at 563. Years later the Supreme Court in *The Montello*, 87 U.S. (20 Wall.) 430, 22 L. Ed. 391 (1874), wrote:

> The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway.

*Id.* at 441–42.

"Federal admiralty jurisdiction extends to all navigable waters." *Aqua Log, Inc. v. Lost and Abandoned Pre-Cut Logs and Rafts of Logs*, 709 F.3d 1055, 1058 (11th Cir. 2013) (citations omitted). "Thus, for a court to have admiralty jurisdiction, the body of water in question must be navigable." *Id.* The term "navigable" has different meanings in different contexts; as in *Aqua Log, Inc.*, the focus here is on the term's use in establishing the limits of the Court's jurisdiction over admiralty and maritime cases. The applicable test for determining a waterway's navigability is whether the "waterway is capable of supporting commercial activity." *Id.* at 1061. Such a test "promotes and encourages maritime commerce" and "creates a climate conducive to commercial maritime activity." *Id.* (citation omitted). While this test, following

from the *Richardson*, 641 F.2d 314, precedent, "may expand admiralty jurisdiction into waterways that may never be used for commercial maritime activities," "the broad federal interests in protecting and promoting maritime commerce justify this potential encroachment." *Aqua Log, Inc.*, 709 F.3d at 1061–62.

To be clear, the applicable standard for determining whether admiralty jurisdiction is satisfied is not, as Tundidor suggests, one of "historical navigability," derived from *The Daniel Ball*, 19 L. Ed. 999. (Resp. 4 (stating *The Daniel Ball*'s "use of the term 'ordinary condition' is clearly a call for analysis of the waterway notwithstanding unnatural encumbrances; and an actual investigation into the history of the waterway in question")). *See PPL Montana, LLC v. Montana*, 132 S. Ct. 1215, 1228 (2012) (noting *The Daniel Ball* formulation of navigability, "concerning federal power to regulate navigation," "is not applied in the same way" in different types of cases); *Aqua Log, Inc.*, 709 F.3d at 1059, n.3 ("We note the term 'navigable' has different meanings in different contexts. *Kaiser Aetna v. United States*, 444 U.S. 164, 170–72 . . . (1979). In this case, we are concerned only with [the] term as it [is] used to establish the limits of the jurisdiction of the federal courts over admiralty and maritime cases." (alterations added)). "Historical navigability" is not the test, for as the Second Circuit in *LeBlanc* explained: (1) *The Daniel Ball*'s reference to "'ordinary condition'" "refers not to the absence of human interference with the course of the river, but 'to volume of water, the gradients and the regularity of the flow' of the waterway[,]" 198 F.3d at 357 (alteration added); (2) "nothing in *The Daniel Ball* indicates that an historically navigable river remains navigable for admiralty jurisdiction purposes when it is made impassable by an artificial obstruction[,]" *id.* (alteration added); and (3) "every circuit court to confront the question has rejected the historic navigability jurisdictional test when determining admiralty jurisdiction[,]" *id.* at 358 (alteration added; citations omitted).

Indeed, in *Aqua Log, Inc.*, the Eleventh Circuit held "a waterway is navigable for admiralty-jurisdiction purposes if, *in its present state*, it is capable of supporting commercial activity." 709 F.3d at 1056 (emphasis added).

The Eleventh Circuit clearly adopted the "capable of supporting commercial activity" test for navigability in *Aqua Log, Inc.*, but it did not have occasion to apply it given the parties there agreed the waterways in question satisfied the test. *Id.* at 1062. In the course of its discussion, the Eleventh Circuit did rely on other circuit court decisions where the navigability-prong of admiralty jurisdiction in tort was examined. *See id.* at 1060 (citing cases). The navigability determinations made in those cases are summarized here to serve as the background for application of the "capable of supporting commercial activity" test to the present facts.

In *Chapman v. United States*, 575 F.2d 147 (7th Cir. 1978) (en banc), the court found admiralty jurisdiction did not exist over claims arising out of the operation of small pleasure boats over waters that had been navigable and used for commercial transportation in the past but were presently used only for recreational activities. In *Chapman*, a fisherman's boat located on the Kankakee River was swept over an unmarked submerged dam and capsized, causing the death of Chapman. *See id.* at 147. The island on which the east end of the dam abutted was a public recreational park, *see id.* at 148; and the Kankakee was home to a series of bridges, dams, overhead wires and submarine cables constructed and installed over time, *see id.* at 149. While "a navigable river is not rendered non-navigable by artificial obstruction[,] . . . if the damming of a waterway has the practical effect of eliminating commercial maritime activity, no federal interest is served by the exercise of admiralty jurisdiction over the events transpiring on that body of water, whether or not it was originally navigable." *Id.* (alterations added) (quoting *Adams v. Montana Power Co.*, 528 F.2d 437, 440 (9th Cir. 1975)). Because the Kankakee was

not used for commercial navigation and was "not susceptible of such use in [its] present state," *id.* at 151 (alteration added), the court lacked admiralty jurisdiction.

*Adams*, the reasoning of which the *en banc* panel in *Chapman* adopted, *see* 575 F.2d at 149, concerned the capsizing of a small pleasure boat on a dam-obstructed body of water (a river) no longer used in commercial maritime shipping. *See Adams*, 528 F.2d at 439. The court in *Adams* began with the well-accepted principle "[a] waterway is navigable provided that it is used or susceptible of being used as an artery of commerce." *Id.* (alteration added) (citing *The Daniel Ball*, 19 L. Ed. 999; other citation omitted). "Neither non-commercial fishing nor pleasure boating nor water skiing constitutes commerce." *Id.* Given the purpose of admiralty jurisdiction to protect and promote the maritime shipping industry by the development and application of a uniform and specialized body of federal law, that jurisdiction extends "only to those waters traversed or susceptible of being traversed by commercial craft." *Id.* Because no commercial shipping occurred or was likely to occur on the dam-obstructed portion of the Missouri River into which the small pleasure boat capsized, "the waterway was non-navigable in a jurisdictional sense." *Id.* at 440.

Significantly, the *Adams* court noted the distinction between navigability under the commerce clause and navigability for purposes of admiralty jurisdiction:

> The definitions of navigability may vary because . . . the purposes served by the commerce clause and admiralty jurisdiction may vary. . . . The damming of a previously navigable waterway by a state cannot divest Congress of its control over a potentially useful artery of commerce, since such obstructions may always be removed. Hence the courts have reasonably held that a navigable river is not rendered non-navigable by artificial obstruction.
>
> However, if the damming of a water-way has the practical effect of eliminating commercial maritime activity, no federal interest is served by the exercise of admiralty jurisdiction over the events transpiring on that body of water, whether or not it was originally navigable. No purpose is served by application of a uniform body of federal law, on waters devoid of trade and

>commerce, to regulate the activities and resolve the disputes of pleasure boaters. . . . . Only the burdening of federal courts and the frustrating of the purposes of state tort law would be thereby served.

*Id.* at 440–41 (alterations added; internal citation and footnote call number omitted).

At issue in *Livingston v. United States*, 627 F.2d 165, 166 (8th Cir. 1980), was whether admiralty jurisdiction existed where appellee's decedent drowned in Norfork River while fishing on a 16-foot flat-bottomed fishing boat equipped with a small outboard motor, downstream from a hydroelectric dam. The boat submerged after the bow struck a steel cable attached to the top of a post on the east bank of the river, which angled downstream into the river where it became lodged in the riverbed. *See id.* In the nineteenth century, settlers floated mineral products, fur pelts, and logs down the Norfork to its confluence with the White River, which in turn flows into the Mississippi River; in the early 20th century logging and other commercial activities were carried on in the Norfork. *See id.* at 167. Construction of the dam completely blocked travel between the river and the lake; consequently by the time of the incident, traffic on the river consisted almost exclusively of small skiffs used for recreational fishing. *See id.* at 168.

In considering the purpose for which the concept of navigability was being invoked — that is, "to establish the limits of federal admiralty jurisdiction," the Eighth Circuit in *Livingston* noted "[e]xtensions of admiralty jurisdiction have followed the opening of new waters to commercial shipping[,]" and similarly "the closing of waters to commercial shipping should likewise have the effect of eliminating admiralty jurisdiction over them." *Id.* at 169 (alterations added; internal citation and footnote call number omitted). As the Eleventh Circuit did in *Aqua Log, Inc.*, the court in *Livingston* adopted a test requiring "'navigability' in admiralty" to be "properly limited to describing a present capability of waters to sustain commercial shipping."

*Id.* at 170.  Because commercial activity on the Norfork ceased after construction of the hydroelectric dam in the 1940s, no admiralty jurisdiction existed.  *See id.* at 170.

The Eleventh Circuit in *Aqua Log, Inc.* described the lower court's reliance on the *Chapman*, *Adams* and *Livingston* decisions as based on what that court described as "a test for navigability that requires evidence of present or potential commercial activity."  709 F.3d at 1060.  The Eleventh Circuit then went on to examine "substantial precedent to the contrary" in *Cunningham v. Director, Office of Workers' Compensation Programs*, 377 F.3d 98 (1st Cir. 2004); *LeBlanc*, 198 F.3d 353; *Price v. Price*, 929 F.2d 131 (4th Cir. 1991); and *Finneseth v. Carter*, 712 F.2d 1041 (6th Cir. 1983).  *Aqua Log, Inc.*, 709 F.3d at 1060.  In *Cunningham*, a pipe fitter appealed an administrative law judge's and benefits review board's determinations a manufacturing plant several miles from a shipyard was not a covered work location under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), resulting in a denial of disability benefits.  377 F.3d at 101.  While the case concerned the LHWCA and whether the plant where the injury occurred was an "other adjoining area" under that statute, *see id.* 101–02, the court approved the administrative decisions' reliance on a definition of "navigable" that "derives from admiralty law" *id.* at 108.  And in admiralty, "navigability" means "'a present capability of waters to sustain commercial shipping,' or 'contemporary navigability in fact.'"  *Id.* at 108 (quoting *Livingston*, 627 F.2d at 169–70).

In *LeBlanc*, kayakers paddling on the Hudson River, some 29 miles upstream of Fort Edward, were injured when their kayak was struck by a recreational motor boat.  *See LeBlanc*, 198 F.3d at 355.  The accident site was separated from Fort Edward, and from any interstate or international waterway, by numerous impassable rapids, falls, and artificial dams; many years prior to construction of the dams, logs were floated down the Hudson near that accident site.  *See*

*id.* at 357, 359. In affirming the lower court's dismissal of the tort action for lack of federal admiralty jurisdiction, the Second Circuit rejected the jurisdictional test urged by appellants that focused on the historic navigability of the waterway given "the distinction between legislative authority under the Commerce Clause and admiralty jurisdiction." *Id.* at 358. The Second Circuit articulated the test "a waterway at the situs in issue is navigable for jurisdictional purposes if it is presently used, or is presently capable of being used, as an interstate highway for commercial trade or travel in the customary modes of travel on water." *Id.* at 359. The inquiry focuses on the particular site where the accident occurred. Significantly for purposes of the present case, "[n]atural and artificial obstructions that effectively prohibit such commerce defeat admiralty jurisdiction." *Id.* (alteration added).

The Fourth Circuit in *Price* considered whether the district court was correct in finding it lacked admiralty jurisdiction over a personal injury action involving injuries to a passenger while disembarking from a small pleasure boat on the John H. Kerr Reservoir in Virginia. *See Price*, 929 F.2d at 133. Because jurisdiction cannot depend on whether "on any given day" "commercial maritime activity is being conducted on the waters," "the test for navigability is based on a broader and more stable factor than whether the body of water is currently being used for commercial navigation. It must also include a consideration of whether the body of water is *capable* of bearing commercial navigation." *Id.* at 134 (emphasis in original). The court further described the navigability test as consisting of "two disjunctive aspects": "waters are navigable if they are currently being used as a highway of commerce *or* if they are susceptible of being so used." *Id.* (emphasis in original). And "[w]aters are susceptible of such use when they are, in their current configuration, capable of commercial navigation." *Id.* (alteration added). In *Price*, the district court's error consisted in focusing on whether the Reservoir was "currently being

14

used for commercial navigation"; the parties conceded it was capable of supporting commercial shipping notwithstanding its then-present use almost entirely for pleasure boating and one professional fishing guide who made his living chartering boats on the lake. *Id.* at 134–35.

Last, in *Finneseth*, two pleasure boats collided on the Dale Hollow Lake, a lake devoted to pleasure craft, straddling Kentucky and Tennessee, formed when the Corps of Engineers constructed a dam on the Obey River. *See Finneseth*, 712 F.2d at 1042. The boats on the lake could not travel past the dam as the dam was without locks. *See id.* In reversing the district court's conclusion it lacked admiralty jurisdiction, the Sixth Circuit similarly relied on a capable-of-use navigability test: "[A]n artificial water body, such as a man-made reservoir, is navigable in fact for purposes of conferring admiralty jurisdiction if it is used or capable or susceptible of being used as an interstate highway for commerce over which trade or travel is or may be conducted in the customary modes of travel on water." *Id.* at 1044 (alteration added; citing *The Daniel Ball*, 19 L. Ed. 999; *The Montello*, 22 L. Ed. 391). Dale Hollow Lake met the requirements of that test because it was capable of being used in interstate highway for commerce, straddling as it did Kentucky and Tennessee, and could support commercial navigation of the ordinary type during all seasons; it was immaterial that it was not presently so used or that maritime traffic was prevented from traveling downstream by the dam. *See id.* at 1044–45, 1047. The court in *Finneseth* expressly criticized the decision in *Livingston* for requiring contemporary, present commercial maritime activity as a prerequisite for navigability under the admiralty laws. *See id.* at 1045.

B. The Coral Park Canal Is Not a Navigable Waterway

Tundidor has not shown the Coral Park Canal, the site where the accident occurred, is a waterway capable of supporting commercial activity. Rather than support Plaintiff's position,

noted Florida historian Dr. George provides conclusive proof the waterway in question is not navigable and so admiralty jurisdiction is not conferred. Professor George's affidavit acknowledges the S-25B Spillway — a water control structure — prevents the surrounding area of Tamiami Canal from sustaining commercial activity in its present state. As Dr. George states,

> A Spillway (S25B) erected to control the salinity of the waters west of the Spillway now lies [e]ast of the Miami International Airport and south of Northwest Twentieth Street, which, in the manner operated, provides a brief artificial impediment to vessel traffic continuing through the natural flow of water out to the Ocean. However there exists no impediment to minor portage of vessels around the S25B Spillway . . . .

(George Aff. ¶ 12 (alterations added)).

That "unfettered navigation from the canal to the Ocean" (*id.* ¶ 16) requires "[*f*]*uture* removal of the Spillway or construction of adjacent lock facilities in the *future*" (*id.* (alteration and emphases added)), conclusively establishes the Coral Park Canal is not a waterway presently capable of supporting commercial activity. As noted in *Three Buoys Houseboat Vacations U.S.A. Ltd. v. Morts*, "Neither the possibility of future navigation in the event the Army Corps of Engineers removes the dam nor the prior alleged navigability of the [waterway] before the existence of the dam alters the present facts. The lake cannot be negotiated past the dam. *Present* navigability is the standard . . . . " 921 F.2d 775, 779 (8th Cir. 1990) (alterations added; emphasis in original). *See also Alford v. Appalachian Power Co.*, 951 F.2d 30, 33 (4th Cir. 1991) ("Should the dam ever be taken down or destroyed and the Roanoke River once again be restored as a navigable waterway between the states, then claims arising from accidents on the river at that time may once again be subject to admiralty jurisdiction.").

The declaration of Mr. Suarez and the three DVDs conventionally filed further show the waterway where the accident occurred is not navigable. Admittedly, Mr. Suarez traveled from the Coral Park Canal to Biscayne Bay. But he did so in a non-motorized boat — a two-person

canoe. Certainly "[n]either non-commercial fishing nor pleasure boating nor water skiing constitutes commerce. Commerce for the purpose of admiralty jurisdiction means activities related to the business of shipping." *Adams*, 528 F.2d at 439 (alteration added; citations omitted).

> Further, once they reached the S25-B Spillway, Mr. Suarez and his companion
> 
> landed the vessel on a grass embankment located on a golf course located on the south side of the structure. Once we landed the vessel on the embankment, we disembarked the vessel, picked up and carried the vessel along the east side of the structure for a distance of a few hundred feet, and then launched the vessel back into the canal waterway flowing on the east side of the structure.

(Suarez Decl. ¶ 15). While, for example, portages do not prevent a river from being part of a channel of interstate commerce, *PPL Montana, LLC*, 132 S. Ct. at 1232 (citation omitted), Tundidor offers no case showing: (1) portage of a two-person canoe for several hundred feet, (2) upon being blocked by a water control structure, (3) between a canal and a bay that leads out to the ocean, does not defeat the navigability of a waterway for purposes of admiralty jurisdiction. *See, e.g., Weaver v. Hollywood Casino-Aurora, Inc.*, 255 F.3d 379, 384 (7th Cir. 2001) ("A dam and bridge which prevent a riverboat casino from traveling over 300 yards are presumably not susceptible to commercial shipping . . . ."); *Chapman*, 575 F.2d at 149 (where court noted "if the damming of a waterway has the practical effect of eliminating commercial maritime activity, no federal interest is served by the exercise of admiralty jurisdiction"); *Adams*, 528 F.2d at 440 (where no commercial shipping occurred or was likely to occur on dam-obstructed portion of river, "waterway was non-navigable in a jurisdictional sense"); *Livingston*, 627 F.2d at 170 (where commercial activity ceased after construction of a hydroelectric dam, no admiralty jurisdiction found); *LeBlanc*, 198 F.3d at 359 (where both natural and artificial obstructions prohibited commercial trade or travel, no admiralty jurisdiction found); *cf. Price*, 929 F.2d at

Case 1:14-cv-23850-CMA Document 46 Entered on FLSD Docket 06/04/2015 Page 18 of 19
CASE NO. 14-23850-CIV-ALTONAGA

134–35 (admiralty jurisdiction found where parties conceded waterway was capable of supporting commercial shipping despite its present use for pleasure boating and fishing); *Finneseth*, 712 F.2d at 1044–45 (waterway located between two states was navigable at site where pleasure boats collided, although dam prevented maritime traffic farther downstream).

The County's professional engineer, Ms. Blanco-Pape, submitted an affidavit attesting that at the Coral Park Canal connection to the C-4 or Tamiami Canal, a low lying bridge not intended for navigation by vessels is found, and the Coral Park Canal is connected to the C-2 or Snapper Creek Canal by a non-navigable culvert. (*See* Blanco-Pape Aff. ¶ 5). She further attests, as can be seen in the DVDs submitted conventionally, that there are a series of control gates, culverts, and pump stations interrupting through and open navigation from the Tamiami Canal to the Miami River and Biscayne Bay. (*See id.* ¶ 7). Plaintiff's own "Boating Accident Report" [ECF No. 36-3] supports the County engineer's statements, as its "Detailed Narrative" states "[a]ll four persons on board [Plaintiff's 16-foot, single engine boat] saw the bridge coming and lowered their heads." (*Id.* at 2 (alterations added)).

## IV. CONCLUSION

Plaintiff's accident while a passenger on board a 16-foot single engine pleasure craft occurred on the Coral Park Canal. The only point of access from that Canal to the Tamiami Canal is a low-lying bridge not designed or intended for the passage of vessels; indeed, the passengers on the small pleasure boat, as well as Mr. Suarez later in his two-person canoe, all had to lower their heads in order to travel under it. The Tamiami Canal in turn has a series of low bridges, water pipes, and railroad tracks with height clearances not designed to permit vessel navigation. A water control structure along the Tamiami Canal prevents vessels from engaging in continuous travel eastbound toward the Miami River and from there to Biscayne Bay. The S-

25B Spillway water control structure has prominent signs on either side stating "NO BOATING BEYOND THIS POINT."

Navigability does not require that a waterway be currently used in commercial activity. But it does require that a waterway be capable in its present state of supporting commercial activity in order to promote maritime commerce and to ensure the same rules will apply on all waterways where maritime commerce may occur. Under the "capable of supporting commercial activity" test announced in *Aqua Log, Inc.*, the Coral Park Canal is simply not a navigable waterway upon which to claim federal admiralty jurisdiction.

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Miami-Dade County's Motion to Dismiss Plaintiff's Amended Complaint **[ECF No. 34]** is **GRANTED**. The Clerk is instructed to mark this case as closed, and all pending motions are denied as moot.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 4th day of June, 2015.

_____
**CECILIA M. ALTONAGA
UNITED STATES DISTRICT JUDGE**

cc:     counsel of record